**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JULIE CARPENTER, Derivatively on Behalf of JUNO THERAPEUTICS, INC., ) ) ) | C.A. No. |
| Plaintiff, ) ) | |
| v. ) ) | DEMAND FOR JURY TRIAL |
| HANS E. BISHOP, STEVEN D. HARR, MARK J. GILBERT, HOWARD H. PIEN, RICHARD D. KLAUSNER, ROBERT T. NELSEN, ANTHONY B. EVNIN, HAL V. BARRON, MARY AGNES WILDEROTTER, THOMAS O. DANIEL, and MARC TESSIER-LAVIGNE, ) ) ) ) ) ) ) ) ) | |
| Defendants, ) ) | |
| -and- ) ) | |
| JUNO THERAPEUTICS, INC., a Delaware corporation, ) ) ) | |
| Nominal Defendant. ) ) | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Juno Therapeutics, Inc. ("Juno" or the "Company"), against certain of its current and former officers and directors for violation of securities law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in billions of dollars in damages to Juno's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Juno is a biopharmaceutical company that develops cell-based cancer immunotherapies.  The Company creates these immunotherapies by using its chimeric antigen receptor ("CAR") and T cell receptor ("TCR") technologies to genetically engineer T cells that recognize and kill cancer cells.  In 2010, Juno began to begin developing JCAR015, an immunotherapy intended to use this technology to treat a type of blood cancer called acute lymphoblastic leukemia ("ALL").

3.      In order to sell JCAR015 in the United States, Juno must first receive approval from the U.S. Food and Drug Administration ("FDA").  This is a long, arduous, and expensive process.  It requires lengthy, expensive, and time-consuming tests and trials.  The further a company proceeds through the testing process, the larger, longer, and more expensive the trials become.

4.      The first stage in the process is a Phase I trial in which a company tests a medication's safety, appropriate dosage, and side effects on a small group of patients.  This is followed by a Phase II trial which uses a larger group of patients to test a drug's effectiveness and side effects.  Phase III, normally the final phase in the approval process, uses the largest

group of patients.  Phase III clinical trials compare the medication to other commonly used treatments and provide further information on the medication's safety and efficacy.  According to FDA guidelines and pharmaceutical standards, these trials usually take several years to complete to determine the long-term effects of a medication on patients.

5.      Juno and rival companies, Novartis AG ("Novartis") and Kite Pharmaceuticals ("Kite"), competed to become the first company to market an FDA approved CAR T cell therapy.  In order to beat its competitors to market, Juno adopted a "fast to market strategy" for JCAR015, which set an initial goal of launching in 2017.

6.      To ensure that JCAR015 was completed within this timeframe, the Individual Defendants (as defined herein) repeatedly misrepresented and withheld material information regarding the safety, efficacy, and success of JCAR015, including the fact that the therapy caused severe neurotoxicity that resulted in several patient deaths.  In particular, they failed to disclose that patients were dying as a result of JCAR015's toxic side effects during the therapy's Phase II trial.  Initiated in the third quarter of 2015, the Company referred to the Phase II trial as the "ROCKET" trial.

7.      On July 7, 2016, defendants disclosed that the FDA had forced the Company to halt the Phase II/ROCKET trial after three patients died over the previous two months due to severe neurotoxicity associated with JCAR015.  This disclosure caused Juno to suffer over a $1.4 billion, or 33%, market cap loss.  The Company also had to delay its launch of JCAR015 to 2018 at the earliest, thus foreclosing Juno's opportunity to become the first company to market a CAR T cell therapy for ALL.

8.      Despite these developments, the Individual Defendants continued to downplay the Phase II/ROCKET trial patient deaths by withholding material facts connecting JCAR015 with

potentially fatal neurotoxicity.  Specifically, the Individual Defendants represented that the three fatalities resulted from Juno's usage of a chemotherapy medication called fludarabine ("flu") as a preconditioning regimen for JCAR015.  According to the Individual Defendants, the introduction of flu to JCAR015 caused cerebral edemas that led to the patient deaths.

9.      The Individual Defendants made this assertion despite the fact that the Company's own investigation found that the severe neurotoxicity could have resulted from attributes of JCAR015, or the product's chemistry, manufacturing, and controls.  Ignoring the potentially fatal risks of JAR015 itself, the Individual Defendants sought to continue the Phase II/ROCKET trial by using only cyclophosphamide ("cy") as a preconditioning regimen for JCAR015.  Prior to the clinical hold, the Company used cy and flu as preconditioning regimens for the therapy.  In a July 7, 2016 press release, the Individual Defendants stated that "Juno has proposed to the FDA to continue the ROCKET trial using JCAR015 with [cy] pre-conditioning alone."  The FDA granted this request.

10.      On November 23, 2016, Juno announced that it would be voluntarily placing the Phase II/ROCKET trial on hold, due to two additional patient deaths stemming from cerebral edemas even though the patients used cy, not flu, as the preconditioning agent.  These fatalities brought the JCAR015 therapy's death toll to five out of thirty-eight patients.  Moreover, this revelation caused Juno to incur a massive one-day market cap loss of over $774.9 million on November 23, 2016.  The Company's stock price dropped $7.32 per share, or 24.5%, to close at $22.56 per share that day.

11.      On March 1, 2017, Juno announced that it was ceasing further development of JCAR015.  The Company cited the therapy's "toxicity" as its reason for this decision.  This disclosure caused the Company to incur a four-day market cap loss of over $477 million.  Juno's

stock price dropped $4.51 per share during that period, or 17.8%, to close at $20.80 per share on March 7, 2017.

12.     While the Individual Defendants were breaching their fiduciary duties, Juno's Chief Executive Officer ("CEO"), defendant Hans E. Bishop ("Bishop"), was reaping millions of dollars in profit by selling his personal shares of Juno stock based on nonpublic information regarding JCAR015's fatal toxicity.  Between June 4, 2016 and November 22, 2016, defendant Bishop realized almost $15 million from sales of his personal shares of Juno stock.

13.     Additionally, in 2015 and 2016, while the Individual Defendants misled Juno investors and the public regarding the safety, success, and efficacy of JCAR015, the Company's nonemployee directors abused their power as members of the Board of Directors (the "Board") to provide themselves with excessive compensation.  According to Juno's Proxy Statement on Form DEF 14A filed with the SEC on April 20, 2016 (the "2016 Proxy"), defendants Howard H. Pien ("Pien"), Hal V. Barron ("Barron"), Anthony B Evnin ("Evnin"), Richard D. Klausner ("Klausner"), Robert T. Nelsen ("Nelsen"), Marc Tessier-Lavigne ("Tesser-Lavigne"), and Mary Agnes Wilderotter ("Wilderotter") (collectively, the "Nonemployee Director Defendants") received between $552,752 and $582,752 in compensation in 2015.  This is $350,000 more than the median outside director compensation amount for similarly-sized companies.[1]

_____

[1] In November 2016, FW Cook, an executive compensation consulting firm, released its 2016 Director Compensation Report (the "FW Cook Report").  Juno is considered a "mid-cap" company for 2015, under the FW Cook Report's criteria, because its market capitalization was between $1 billion and $5 billion.  The FW Cook Report provided that in 2015, the median compensation amount for nonemployee directors of mid-cap companies was $197,750.  However, Juno's lowest paid nonemployee director that year, defendant Klausner, received $552,752 (over $350,000 more than the median compensation amount for mid-cap companies in 2015).

14.     According to the Company's Proxy Statement on Form DEF 14A filed with the SEC on April 24, 2017 (the "2017 "Proxy"), in 2016, the Nonemployee Director Defendants received between $344,168 and $381,396.  That year, the Company's lowest paid nonemployee director received nearly $150,000 more than the median outside director compensation amount for similarly-sized companies.[2]

15.     The Board's Compensation Committee, comprised of Nonemployee Director Defendants Nelsen, Tessier-Lavigne, and Pien, recommended that the Board approve a director compensation policy (the "2015 Nonemployee Director Compensation Policy."  Subsequently, Juno's Board, a majority of whose members were nonemployee directors, approved the policy.

16.     On April 20, 2016, defendants Thomas O. Daniel ("Daniel"), Barron, Klausner, Nelsen, Tessier-Lavigne, Wilderotter, Bishop, Pien, and Evnin (the "2016 Proxy Defendants") negligently caused the Company to issue the  materially misleading 2016 Proxy in violation of section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  These defendants claimed, in the 2016 Proxy, that a compensation policy was necessary to attract, retain, and reward Company nonemployee directors (the "2016 Nonemployee Director Compensation Policy").  However, the Company was already providing its nonemployee directors with significantly excessive compensation, a problem the 2016 Nonemployee Director Compensation Policy would perpetuate.

17.     Furthermore, the 2016 Proxy Defendants claimed, in the 2016 Proxy, that they sought stockholder approval for the 2016 Nonemployee Director Compensation Policy "in the

---

[2] According to the FW Cook Report, the median compensation amount for nonemployee directors of mid-cap companies was $200,000 in 2016.  Juno was again a mid-cap company in 2016 under the FW Cook Report's criteria.  Its lowest paid nonemployee director that year, defendant Tessier-Lavigne, received $344,168 (nearly $150,000 more than the median compensation amount for nonemployee directors of mid-cap companies in 2016).

interests of good corporate governance."  However, this statement misleadingly suggests that the Individual Defendants were maintaining good corporate governance at the time the 2016 Proxy was issued.  In 2016, Juno's Board and its Scientific Committee, including defendants Barron, Daniel, Klausner, and Tessier-Lavigne, failed to uphold their duties to review, evaluate, and manage the risks associated with the Company's most important development product candidate, JCAR015.

18.     As a direct result of the Individual Defendants' wrongful course of conduct, Juno investors filed federal securities class action lawsuits against the Company.  The court consolidated these lawsuits as *In re Juno Therapeutics Inc.*, C.A. No. 2:16-cv-1069-RSM (W.D. Wash.).  On June 14, 2017, Chief Judge Ricardo S. Martinez issued an order in the consolidated securities class action, denying defendants Bishop, Steven D. Harr ("Harr"), Mark J. Gilbert ("Gilbert"), and Juno's motion to dismiss.  Judge Martinez held that plaintiffs had stated a claim against these defendants.  As a result, there is a strong likelihood that the Individual Defendants' misconduct and false statements, regarding JCAR015, will cause Juno to incur substantial liability.

19.     Plaintiff now brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

20.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

21.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Juno maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

23.     Plaintiff Julie Carpenter was a stockholder of Juno at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Juno stockholder.

**Nominal Defendant**

24.     Nominal defendant Juno is a Delaware corporation with principal executive offices located at 400 Dexter Avenue North, Suite 1200, Seattle, Washington.   Juno is a biopharmaceutical company focused on developing cellular immunotherapies for the treatment of cancer.   Specifically, Juno develops cell-based cancer immunotherapies based on CAR and high-affinity TCR technologies to genetically engineer T cells to recognize and kill cancer.   The Company is developing multiple cell-based product candidates to treat a variety of B cell

malignancies as well as multiple solid tumors and multiple myeloma.  Juno's long-term aim is to leverage its cell-based platform to develop new product candidates that address a broader range of cancers and human diseases.  As of December 31, 2016, Juno had 553 employees globally.

**Defendants**

25.    Defendant Bishop is Juno's President, CEO, and a director and has been since September 2013.  Defendant Bishop cofounded the Company in August 2013.  Defendant Bishop is named as a defendant in the related consolidated securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Bishop knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants.  Defendant Bishop also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy.  Moreover, while in possession of material, nonpublic information concerning Juno's true business health, defendant Bishop sold 399,750 shares of his stock for $14,615,022.72 in proceeds.  Juno paid defendant Bishop the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $483,894 | - | $3,069,500 | $200,000 | $3,753,394 |
| 2015 | $425,000 | $148,750 | $4,449,326 | $276,250 | $5,299,326 |

26.    Defendant Harr is Juno's Chief Financial Officer and Head of Corporate Development and has been since April 2014.  Defendant Harr is named as a defendant in the related consolidated securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Harr knowingly or recklessly: (i) caused or allowed Juno

to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; and (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015.  Juno paid defendant Harr the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------|---------------|----------------------------------------|-------|
| 2016 | $404,954 | - | $2,378,863 | $131,840 | $2,915,657 |
| 2015 | $400,000 | $112,000 | $2,701,300 | $208,000 | $3,421,300 |

27.    Defendant Gilbert is Juno's Senior Vice President and Chief Medical Officer and has been since March 2014.  Defendant Gilbert is named as a defendant in the related consolidated securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Gilbert knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; and (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015.

28.    Defendant Pien is Juno's Chairman of the Board and has been since September 2014 and a director and has been since January 2014.  Defendant Pien knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants.  Defendant Pien also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy.  Juno paid defendant Pien the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | - | $80,014 | $301,382 | $381,396 |
| 2015 | $77,500 | - | $505,252 | $582,752 |

29.     Defendant Klausner is a Juno director and has been since August 2013. Defendant Klausner cofounded Juno in August 2013. Defendant Klausner was also a member of Juno's Scientific Committee from at least April 2016 to at least April 2017. Defendant Klausner knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants. Defendant Klausner also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy. Juno paid defendant Klausner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation[3] | Total |
|---|---|---|---|---|---|
| 2016 | - | $47,508 | $301,382 | $250,000 | $598,890 |
| 2015 | $47,500 | - | $505,252 | - | $552,752 |

30.     Defendant Nelsen is a Juno director and has been since August 2013. Defendant Nelsen cofounded Juno in August 2013. Defendant Nelson was also a member of Juno's Audit Committee from February 2016 to May 2017. Defendant Nelsen knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual

---

[3] The total compensation paid to defendant Klausner in 2016 includes $250,000 earned pursuant to a consulting agreement effective January 2016. This amount is reflected in the "All Other Compensation" column. Under the agreement, which expires December 31, 2018, defendant Klausner provides general advisory services to Juno in exchange for an annual fee of $250,000 paid quarterly.

Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants. Defendant Nelsen also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy. Juno paid defendant Nelsen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | - | $52,772 | $301,382 | $354,154 |
| 2015 | $48,500 | - | $505,252 | $553,752 |

31.     Defendant Evnin is a Juno director and has been since January 2014. Defendant Evnin is also a member of Juno's Audit Committee and has been since at least April 2016. Defendant Evnin knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants. Defendant Evnin also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy. Juno paid defendant Evnin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | - | $57,516 | $301,382 | $358,898 |
| 2015 | $60,567 | - | $505,252 | $565,819 |

32.     Defendant Barron is a Juno director and has been since September 2014. Defendant Barron was also Chairman of Juno's Scientific Committee from August 2016 to at least April 2017 and a member of that committee from at least April 2016 to at least April 2017, and a member of the Audit Committee in at least January 2016. Defendant Barron knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015,

despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants.  Defendant Barron also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy.  Juno paid defendant Barron the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | - | $54,656 | $301,382 | $356,038 |
| 2015 | $55,000 | - | $505,252 | $560,252 |

33.    Defendant Wilderotter is a Juno director and has been since November 2014. Defendant Wilderotter is also Chairman of Juno's Audit Committee and a member of that committee and has been since at least April 2016.   Defendant Wilderotter knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached her fiduciary duties by excessively compensating the Nonemployee Director Defendants.   Defendant Wilderotter also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy.   Juno paid defendant Wilderotter the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2016 | $64,500 | $301,382 | $365,882 |
| 2015 | $55,433 | $505,252 | $560,685 |

34.    Defendant Daniel is a Juno director and has been since August 2015.  Defendant Daniel was a member of Juno's Scientific Committee from at least April 2016 to at least April 2017.   Defendant Daniel knowingly or recklessly: (i) caused or allowed Juno to expend

substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants.  Defendant Daniel has received the following compensation during his time as a director:

| Defendant | Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|---|
| Daniel, Thomas O.[4] | 2016 | $100,000 | $100,000 |

35.     Defendant Tessier-Lavigne was a Juno director from January 2014 to August 2016.  Defendant Tessier-Lavigne is a Scientific Advisor to Juno and has been since August 2016.   Defendant Tessier-Lavigne was also Chairman of Juno's Scientific Committee and a member of that committee from at least April 2016 to August 2016.  Defendant Tessier-Lavigne knowingly or recklessly: (i) caused or allowed Juno to expend substantial resources developing JCAR015, despite having knowledge of the therapy's potentially fatal side effects; (ii) caused or allowed the Individual Defendants to make improper statements about the safety, success, and efficacy of JCAR015; and (iii) breached his fiduciary duties by excessively compensating the Nonemployee Director Defendants.  Defendant Tessier-Lavigne also negligently violated section 14(a) of the Exchange Act by causing Juno to make misleading statements in its 2016 Proxy.  Juno paid defendant Tessier-Lavigne the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $42,786 | $301,382 | $17,397 | $361,565 |

---

[4] The $100,000 defendant Daniel received in 2016 was paid by Celgene Corporation, not Juno. Until April 1, 2017, defendant Daniel waived all compensation from Juno, and was instead paid $50,000 per quarter by Celgene Corporation for his service on the Juno Board.

36.     The defendants identified in ¶¶25-27 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶25, 28-35 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶30-33 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶29, 32, 34-35 are referred to herein as the "Scientific Committee Defendants."  Collectively, the defendants identified in ¶¶25-35 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

37.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Juno and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Juno in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Juno and not in furtherance of their personal interest or benefit.

38.     To discharge their duties, the officers and directors of Juno were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Juno were required to, among other things:

(a)     accurately guide the Company's stockholders and the public when speaking about Juno's business prospects, including the safety, success, and efficacy of JCAR015;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide

the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     refrain from using nonpublic information about the Company for their personal benefit;

(d)     exercise good faith in using their discretion to set their compensation amounts; and

(e)     remain informed as to how Juno conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

39.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Juno, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

40.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public and Juno's stockholders, issue a misleading proxy statement, and engage in improper practices that wasted the Company's assets, and caused Juno to incur substantial damage.  Moreover, defendant Bishop abused his duty of loyalty by selling his personal shares of Juno stock based on nonpublic information about the Company's financial health.

41.     The Individual Defendants, because of their positions of control and authority as

officers and/or directors of Juno, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Juno has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

42.    In addition to these duties, under the Audit Committee Charter in effect since 2014, the Audit Committee Defendants, defendants Barron, Evnin, Nelson, and Wilderotter, owed specific duties to Juno regarding the issuance of Company earnings press release and earning guidance.  According to Audit Committee Charter:

> The Committee shall discuss with management and the outside independent auditor the Company's earnings press releases, if any (with particular focus on any "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance, if any, provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made). The Committee should be furnished with an advance copy of each earnings release for its review prior to publication.

43.    The Audit Committee Charter also provides that the Committee has the duty to "review and discuss the quarterly financial statements … with management and the outside independent auditor."

**Additional Duties of the Scientific Committee Defendants**

44.    In addition to the previously discussed duties, under the Scientific Committee Charter in effect since 2014, the Scientific Committee Defendants, defendants Barron, Daniel, Klausner, and Tessier-Lavigne, owed specific duties to Juno to assist the Board in overseeing various matters, including the development of JCAR015.

45.    The Scientific Committee Defendants have the following duties, pursuant to the

Scientific Committee Charter: (i) the duty to "review, evaluate and report to the Board regarding strategy, plans and goals, as well as progress and performance, of the Company's clinical programs and research and development activities"; (ii) the duty to "review and evaluate the infrastructure and resources made available by the Company for its clinical programs and research and development projects, and make recommendations as appropriate if the infrastructure and/or resources are insufficient, in the opinion of the Committee, to accomplish the Company's clinical development programs and research and development projects"; and (iii) the duty to "identify and discuss significant emerging regulatory, research and scientific issues and trends and competitive activity, including their potential impacts on any Company programs, plans, or policies relating to its clinical programs, and research and development activities."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Juno, regarding the Individual Defendants' management of Juno's operations, and the safety, success, and efficacy of its product, JCAR015; (ii) facilitate defendant Bishop's illicit sale of nearly $15 million of  his personally held shares while in possession of material, nonpublic information; (iii) negligently mislead Company investors through the 2016 Proxy; and (iv) enhance the Individual Defendants' executive and directorial

positions at Juno and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

48.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

49.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

52.     Juno is a biopharmaceutical company that develops cell-based cancer immunotherapies.  Immunotherapy seeks to utilize patients' own immune systems to combat cancerous tumors.  The Company uses CAR T cell therapy to treat blood cancers.

53.     T cells have the ability to attack cancerous cells within a patient's body.  The CAR T cell therapy process involves the extraction and collection of patients' white blood cells. Researchers then isolate T cells from the patients' white blood cells.  After the researchers isolate patients' T cells, they engineer the T cells to produce CAR or proteins that attack cancerous cells.

54.     CAR T cell therapy patients typically begin their treatments by undergoing standard chemotherapy to destroy their existing T cells.  This process allows the genetically engineered T cells to grow within the patients' bodies.  After the patients' existing T cells have been destroyed through standard chemotherapy, they are injected with the genetically engineered T cells.

55.     In December 2015, as part of the Phase II trial of JCAR015, the Individual Defendants treated patients with a combination of two chemotherapies, flu and cy, prior to injecting them with genetically modified T cells.  The flu/cy combination was intended to eradicate patients' existing T cells in preparation for the JCAR015 injection.  The Individual Defendants referred to this Phase II trial as the "ROCKET" trial.

56.     The Individual Defendants repeatedly represented, to Juno investors and the public, that JCAR015 was a critical element of the Company's business.  Additionally, in Juno's 2015 Annual Report on Form 10-K, filed with the SEC on February 29, 2016, and signed by defendants Bishop, Harr, Pien, Barron, Daniel, Evnin, Klausner, Nelsen, Tessier-Lavigne, and

Wilderotter, defendants described JCAR015 as the Company's "most advanced development product candidate."

57.     Juno competed with rival companies, Novartis and Kite, in an effort become the first company to market an FDA-approved immunotherapy that targeted ALL.  To ensure Juno's success against its competitors, the Company utilized a "fast to market strategy" to hastily complete the JCAR015 therapy's development process.  The Company set an initial goal to launch JCAR015 in 2017.

58.     The Individual Defendants attempted to complete the development of JCAR015 prior to the intended December 2017 launch, but significant complications, including patient deaths, prevented them from achieving that goal.  Ultimately, in March 2017, after multiple patient deaths, and months of the Individual Defendants' material false statements and omissions, regarding the safety, success, and efficacy of JCAR015, the Individual Defendants caused the Company to announce that it would cease development of JCAR015.  The Individual Defendants cited JCAR015's toxicity as a factor in the Company's decision to halt the therapy's development.

## IMPROPER STATEMENTS

59.     In December 2015, claiming that a flu/cy chemotherapy combination would make JCAR015 more effective, the Individual Defendants began using this preconditioning regimen to destroy patients' existing T cells prior to injecting JCAR015 into their bodies.  However, in May 2016, a Phase II/ROCKET trial patient died as a result of a cerebral edema.  At the time, the Individual Defendants chose to conceal this death from Juno investors and the public.

60.     On June 4, 2016, just weeks after the first Phase II/ ROCKET trial patient death, Juno issued a highly misleading press release regarding JCAR015 that celebrated the Phase

II/ROCKET trial's allegedly positive results but failed to disclose the patient death.  In the press release, defendant Gilbert stated:

> The ongoing efficacy and duration of response for a large percentage of patients, specifically those who do not go on to stem cell transplant, continues to be impressive….   These findings provide us with further confidence about our development strategy and the ongoing Phase II ROCKET pivotal trial.

61.    Three days later, during the Jefferies Health Care Conference, defendant Harr presented positive results, regarding Juno's "most advanced product candidates."   Defendant Harr's glowing remarks about JCAR015's supposed progress, however, omitted the Phase II/ROCKET trial patient death that occurred the previous month.  Defendant Harr stated:

> We have, across multiple different studies now, somewhere between 82% and 100% complete remission rates. And, in fact, with our most advanced product candidates and our current way we're treating patients, we've now treated 36 patients over the course of the last year in either adults or kids with ALL. And all 36 patients have not only a complete remission, but all 36 patients have the tougher bar of a complete molecular remission. So, standard of care is kind of a 3% to 5% complete molecular remission rate. We're now at 100%.
>
> ...JCAR015 is our fast-to-market strategy. So, it's currently in a trial that, if positive, will serve as a registration study. You can see we have a complete remission rate of around 80% and a complete molecular remission rate of around 65%.

62.    That same day, June 7, 2016, Juno filed a Current Report on Form 8-K that included a corporate presentation.   The presentation contained a claim that JCAR015 had a complete response/remission rate of 82% and a severe neurotoxicity rate of 29%, but no mention of the patent deaths.

63.    Defendant Bishop attended the Goldman Sachs Global Health Care Conference on June 9, 2016.  During the Conference, defendant Bishop presented "very encourag[ing]" data, regarding JCAR015, and failed to disclose the May 2016 Phase II/ROCKET trial patient death. Defendant Bishop stated:

> So our most advanced program is with a product candidate called JCAR015. It's in adult ALL. It's currently enrolling a multicenter Phase II study, which we plan to support approval, accelerated approval…. So we're very encouraged by that response rate, in the 70% range, percentage of patients, when you look at all comers, getting to a durable response in the 40% range.

> JCAR015 … for today is pretty conventional CAR T cell technology in that we do no selection of the incoming cells from the patient. We take what we start with and make the product.

64.     On July 7, 2016, Juno issued a press release announcing the FDA's hold on the Phase II/ROCKET trial following the deaths of two *additional* Phase II/ROCKET trial patients at the end of June 2016.

65.     That same day, July 7, 2016, Juno held a conference call to discuss the clinical hold.  During the call, defendant Bishop disclosed for the first time that a Phase II/ROCKET trial patient had died from a cerebral edema in May 2016.  Defendant Bishop claimed that the Company reported this patient death to the FDA and Juno's Data Safety Monitoring Board, but failed to explain why the Company did not disclose this material development to Juno investors and the public.

66.     Also during the call, defendant Gilbert informed investors and analysts that all three Phase II/ ROCKET trial patients died as a result of neurotoxicity associated with JCAR015. He further alleged that Juno's introduction of flu as a preconditioning regimen in the Phase II/ROCKET trial increased the incidence of severe neurotoxicity that ultimately caused the June 2016 patient deaths from cerebral edemas.  Later in the call, defendants Bishop and Harr continued to make materially misleading statements regarding the dangerous and/or deadly side effects of JCAR015 itself, by attributing the deaths to the flu/cy combination.  They stated:

> [Defendant Bishop:] ...we believe the addition of [flu], when combined with JCAR015 is the most likely and the most appropriately modifiable factor. Indeed, with cy alone, which we have used in the greatest number of patients treated in the ROCKET trial today, there have not been any treatment-related deaths, and

the incidence of severe neurotoxicity is within the range of what we expected in light of the [Phase I] experience.

\* \* \*

[Defendant Gilbert:] If I was to just expand for a moment, the real key for us in our investigations is that the addition of [flu] seemed to hasten the expansion so that it's early -- much earlier and also much more rapid in its rise.

67.     That same day, the Juno released a corporate presentation that discussed developments in the Company's investigation into the Phase II/ROCKET trial patient deaths. The presentation disclosed that the Company conducted a system review of the factors that could have contributed to the severe neurotoxicity resulting in patient deaths.  The review revealed that the severe neurotoxicity that led to the patient deaths could have resulted from attributes of JCAR015, including the product's chemistry, manufacturing, and controls.   However, the Individual Defendants chose to disregard the potentially fatal risks of JCAR015 itself by blaming the patient deaths on other factors, particularly the Company's use of flu as a preconditioning regiment for JCAR015.  Juno stated in its July 7, 2016 press release, that it "has proposed to the FDA to continue the ROCKET trial using JCAR015 with [cy] pre-conditioning alone," as opposed to using cy in conjunction with flu.

68.     On July 12, 2016, Juno issued a press release announcing that the FDA had released the clinical hold on the Phase II/ROCKET trial.  The press release further stated that Juno would continue to enroll patients under a revised protocol that only used cy as a preconditioning regiment for JCAR015.

69.     On August 4, 2016, during a conference call regarding Juno's second quarter 2016 financial results, defendant Bishop continued to characterize the addition of flu to JCAR015 as the cause of the patient deaths.  Defendant Bishop represented to investors that the "intensity" of the flu/cy combination with JCAR015 contributed to rapid T cell expansion in certain patients

that resulted in fatal cerebral edemas.  Defendant Bishop made a similar misleading statement in

Juno's August 4, 2016 press release, discussing the Company's second quarter 2016 financial

results.  Defendant Bishop stated:

> The JCAR015 Phase II ROCKET trial is open again after we amended the
> protocol to return to a [cy]-only preconditioning regimen. If the ROCKET data
> are in the range of the Phase I results, where most patients were treated using this
> preconditioning regimen, we will have the opportunity to change the standard of
> care and offer improved hope for adult patients with relapsed or refractory ALL.

70.     The Company repeated this misleading representation regarding the cause of the

Phase II/ROCKET trial deaths, in its Quarterly Report on Form 10-Q, filed with the SEC on

August 5, 2016, and signed by defendant Harr.  In its Form 10-Q, the Company stated:

> On July 6, 2016, the FDA placed our JCAR015 Phase II trial in
> [relapsed/refractory] ALL on clinical hold after we observed an increased
> incidence of severe neurotoxicity, including two patients who died in late June
> 2016 from cerebral edema, following the recent addition of [flu] to the
> preconditioning regimen used on the trial. There had been one earlier death in the
> trial in May 2016 from cerebral edema in a patient treated with JCAR015 after
> receiving [flu]-containing preconditioning, but a review identified confounding
> factors specific to the event, and the FDA, our data safety monitoring board, and
> Juno each determined that it was appropriate to continue the trial without changes
> to the treatment protocol.  Following the June 2016 deaths and the FDA hold, we
> amended the trial protocol to continue the trial without [flu], returning to the
> original [cy]-only preconditioning regimen.  The FDA removed the clinical hold
> on July 12, 2016.

Moreover, despite the Individual Defendants' knowledge of the severe neurotoxicity associated

with JCAR015, the Company further claimed, in its Form 10-Q, that the Phase II/ROCKET trial

"could support accelerated U.S. regulatory approval [of JCAR015] … as early as the first half of

2018."

71.     On September 13, 2016, defendant Bishop gave a presentation during the Morgan

Stanley Global Health Care Conference.  During the presentation, he again characterized the

introduction of flu to the JCAR015 therapy as the cause of the patient deaths:

Our most advanced product candidate is JCAR015, which is … being studied in adult ALL. It was the trial where we had a setback the last couple of months with some deaths in the trial. I'm sure we'll cover that.

…[T]he Phase I portion of that trial gets about 35% to 40% of adults into a long-term remission, and that today is clearly going to set a new standard of care.

*   *   *

And what we changed in the protocol was the chemotherapy we use before we get the cells, often referred to as a lymphodepletion regime. In our analysis, it was pretty clear that as we increase the intensity of the lymphodepletion, we saw this toxicity emerge. Why? We believe it's multifactorial, but to try and make this as understandable as possible, as you increase the intensity of lymphodepletion, the cells you give then grow more quickly. And we believe that the risk of this particular form of neurotoxicity is related to the speed at which the cells grow. So our recommendation to FDA was to remove [flu], in other words, reduce the intensity of the Lymphodepletion. We've got over 40 patients worth of experience with [cy] alone with JCAR015. And we were encouraged that the benefit to risk of that with [cy] alone was acceptable.

72.     On September 29, 2016, defendant Bishop made similarly misleading statements at the Leerink Partners Rare Disease & Immuno-Oncology Roundtable Conference:

I think the most important thing, before I come to your question on what happened, Michael, is to remind people that we treated about 50 patients in the Phase I trial with JCAR015 at Memorial. The majority of those, more than 40 patients, were with the [cy]-alone pre-conditioning.… So, we think the ROCKET trial, JCAR015, with [cy] alone, has got a very good chance of replicating that Memorial Phase I. And if it does, it's on track for setting a new standard of care.

73.     On November 9, 2016, the Company filed, and defendant Harr signed, the Quarterly Report on Form 10-Q regarding the Company's financial results for the third quarter of 2016.  The Form 10-Q contained misleading statements, regarding the likelihood of JCAR015's "accelerated" regulatory approval, and the cause of the Phase II/ROCKET trial patient deaths, that were nearly identical to the misleading statements contained in the Company's August 5, 2016 Form 10-Q.

## THE TRUTH EMERGES

74.     The truth regarding the fatal neurotoxicity of JCAR015 began to emerge on November 23, 2016, when Juno issued a press release announcing that it had voluntarily placed the Phase II/ROCKET trial on hold because two more Phase II/Rocket trial patients had died of cerebral edemas earlier that week.   Later that day, defendants Bishop, Harr, and Gilbert participated in a conference call to provide investors with additional details regarding these deaths.   Defendant Bishop declared, during the call, that "all options remain on the table," including the option of abandoning the trial, beginning a new study, or continuing the trial using a modified protocol.

75.     Juno's market capitalization suffered a massive decline once the Individual Defendants' materially misleading statements and the fatally toxic side effects of JCAR015 had been exposed.   The Company's stock declined more than 24%, or $7.32 per share, on November 23, 2016, to close at $22.56 per share compared to the previous trading day's closing of $29.88 per share.   Juno incurred a nearly $775 million loss in market capitalization.

76.     The truth continued to emerge on March 1, 2017, when the Company issued a press release announcing that it would cease development of JCAR015.   In the press release, defendant Bishop stated: "[W]e also recognize the unfortunate and unexpected toxicity we saw in our trial addressing ALL with JCAR015.   We have decided not to move forward with the ROCKET trial or JCAR015 at this time."   This announcement caused Juno to incur a four-day stock price drop of 17.8%, or $4.51 per share, to close at $20.80 per share on March 7, 2017, compared to its closing value of $25.31 per share on March 1, 2017.   The Company suffered a $477 million loss of market capitalization during that period.

## INSIDER SALES BY DEFENDANT BISHOP

77.     Rather than providing the market with correct information, defendant Bishop used his knowledge of Juno's material, nonpublic information to sell his personal holdings while the Company's stock was artificially inflated.  As a Juno officer and director, defendant Bishop was privy to material, nonpublic information about the Company's true business health.

78.     Between June 9, 2016 just weeks after the first Phase II/ROCKET trial patient death, and July 7, 2016, defendant Bishop sold 206,000 shares of Juno stock for proceeds of $8,643,460.  Furthermore, during the period between Juno's July 7, 2016 disclosure of the first three Phase II/ROCKET trial patient deaths and Juno's November 23, 2016 announcement that the Company had placed the trial on a voluntary hold, defendant Bishop sold an additional 193,750 shares of Juno stock for proceeds of $5,971,563.

79.     In total, defendant Bishop sold almost $15 million in Juno stock at artificially inflated prices between June 4, 2016 and November 22, 2016.  These stock sales represent a significant departure from his previous stock sale activity.  During this approximately five month long period, defendant Bishop sold nearly twice as much Juno stock as he sold during the six months prior to this period.

| Insider Last Name | Transaction Date | Transaction Code | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **BISHOP** | 6/9/2016 | S | 59,675 | $45.80 | $2,732,906.14 |
| | 6/9/2016 | S | 16,751 | $47.03 | $787,725.83 |
| | 6/9/2016 | S | 8,394 | $47.97 | $402,674.45 |
| | 6/9/2016 | S | 5,930 | $48.74 | $289,037.69 |
| | 6/30/2016 | S | 108,894 | $38.41 | $4,182,106.74 |
| | 6/30/2016 | S | 6,356 | $39.18 | $249,009.01 |
| | 8/31/2016 | S | 42,673 | $30.06 | $1,282,554.08 |
| | 9/8/2016 | S | 23,042 | $30.06 | $692,578.00 |

| | | | | | |
|---|---|---|---|---|---|
| | 9/19/2016 | S | 428 | $30.00 | $12,840.00 |
| | 9/20/2016 | S | 6,300 | $30.00 | $189,003.15 |
| | 9/21/2016 | S | 77,307 | $30.30 | $2,342,587.64 |
| | 9/27/2016 | S | 44,000 | $33.00 | $1,452,000.00 |
| **Shares Disposed (Sales)** | | | **399,750** | | **$14,615,022.72** |
| **Shares Disposed (Other)** | | | **0** | | **$0.00** |
| **Total Shares Disposed** | | | **399,750** | | **$14,615,022.72** |

### THE MISLEADING 2016 PROXY BY DEFENDANTS BARRON, KLAUSNER, NELSEN, DANIEL, TESSIER-LAVIGNE, WILDEROTTER, BISHOP, PIEN, AND EVNIN

80.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the 2016 Proxy Defendants, defendants Barron, Klausner, Nelsen, Daniel, Tessier-Lavigne, Wilderotter, Bishop, Pien, and Evnin.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

81.     The 2016 Proxy Defendants caused Juno to issue the 2016 Proxy.  The 2016 Proxy sought stockholder approval of various proposals, including the 2016 Nonemployee Director Compensation Policy.  The 2016 Proxy provided that, under the 2016 Nonemployee Director Compensation Policy, Juno's nonemployee directors would receive $40,000 cash retainers each year, for their service on the Board.  The proposed policy further provided that these nonemployee directors would receive increased compensation for their membership on, and/or chairmanship of, Board committees.  With regard to equity compensation, the 2016 Proxy provides: "Each non-employee director is automatically granted an option to purchase 12,000

shares of [Juno] common stock on the day after each of [the Company's] annual stockholder meetings."

82.     The 2016 Proxy Defendants claimed that the 2016 Nonemployee Director Compensation Policy was necessary to "attract the best available personnel," encourage the Company's nonemployee directors to remain on the Board, and "reward them for their service." However, the Company was already providing its nonemployee directors with significantly excessive compensation, a problem the compensation policy would continue.   The excessive compensation provided to the Nonemployee Director Defendants, through the 2016 Nonemployee Director Compensation Policy, was unwarranted and only served to line the pockets of the Nonemployee Director Defendants.  The 2016 Proxy misled Juno stockholders by falsely representing that the 2016 Nonemployee Director Compensation Policy was necessary to attract, retain, and reward Juno investors.   The 2016 Proxy Defendants' true intention in submitting this policy for stockholder approval was to perpetuate the Board's practice of excessively compensating its nonemployee directors, despite their breaches of their fiduciary duties.  This information was material to Juno stockholders' ability to determine whether to approve the policy.

83.     Additionally, the 2016 Proxy Defendants' claimed, in the 2016 Proxy, that they were submitting the 2016 Nonemployee Director Compensation Policy for stockholder approval "in the interests of good corporate governance."   However, this representation misleadingly suggests that the Individual Defendants were maintaining good corporate governance.  At the time the 2016 Proxy was issued, the Board and its Scientific Committee were failing to uphold their duties to review, evaluate, and manage the risks associated with the Company's most important development product candidate, JCAR015.

84.     The 2016 Proxy contained a representation that "[t]he Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks.  The Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks."  However, during the two month period following the 2016 Proxy Defendants' issuance of the 2016 Proxy, three Phase II/ROCKET trial patients died as a result of severe neurotoxicity associated with JCAR015.  Two additional Phase II/ROCKET trial patients died several months later.  These tragic developments reflect the Board's failure to properly manage the risks associated with JCAR015.

85.     The 2016 Proxy Defendants also claimed, through the 2016 Proxy, that the Board maintained a "Scientific Committee," purportedly tasked with overseeing various aspects of Juno's business, including the JCAR015 clinical program:

### Scientific Committee

The members of our scientific committee are Drs. Barron, Daniel, Klausner, and Tessier-Lavigne. Dr. Tessier-Lavigne is the chairman of our scientific committee. The purpose of the scientific committee is to assist the Board in fulfilling its responsibilities by reviewing and evaluating Juno's research strategy and research, development and clinical programs. To accomplish this purpose, the scientific committee reviews and monitors the science, processes and procedures, and infrastructure underlying Juno's major discovery and clinical development programs, and makes recommendations to the Board and/or management regarding the same.

86.     However, the 2016 Proxy Defendants failed to disclose, through the 2016 Proxy, that the Scientific Committee, which included Nonemployee Director Defendants Barron, Klausner, and Tessier-Lavigne, was not properly reviewing, monitoring, and evaluating the JCAR015 therapy's development process.  The Scientific Committee's failure to uphold these duties is evidenced by the five Phase II/ROCKET trial patient deaths.

87.     The 2016 Proxy misled Juno stockholders by suggesting that the Company was maintaining good corporate governance, when the Board and its Scientific Committee were

failing to uphold their duties to review, evaluate, and manage the risks associate with JCAR015. These failures resulted in the deaths of five patients, and the Company's decision to discontinue its most important development product candidate. The truth regarding Juno's failing corporate governance was material to Juno stockholders' ability to determine whether to approve the policy. The proxy solicitation process in connection with the 2016 Proxy was an essential link in Juno stockholders' decision to approve the 2016 Nonemployee Director Compensation Policy.

### EXCESSIVE COMPENSATION OF DEFENDANTS PIEN, BARRON, EVNIN, KLAUSNER, NELSEN, TESSIER-LAVIGNE, AND WILDEROTTER

88.    In breach of their fiduciary duties, the Nonemployee Director Defendants, defendants Pien, Barron, Evnin, Klausner, Nelsen, Tessier-Lavigne, and Wilderotter, took advantage of their ability to set their own compensation to grant themselves excessive compensation. The 2016 Proxy disclosed that, in April 2015, the Board's Compensation Committee, comprised of Nonemployee Director Defendants Nelsen, Tessier-Lavigne, and Pien, recommended that the Board approve the 2015 Nonemployee Director Compensation Policy.

89.    According to the 2016 Proxy, pursuant to the 2015 Nonemployee Director Compensation Policy, the Nonemployee Director Defendants received between $552,752 and $582,752 in compensation in 2015.[5] These compensation figures are *significantly* greater than the compensation provided to nonemployee directors of companies that were the same size as Juno in 2015. The 2016 Proxy further disclosed that the Board, a majority of whose members were nonemployee directors, approved the 2015 Nonemployee Director Compensation Policy.

---

[5] According to the 2016 Proxy, defendant Daniel did not receive compensation, under the 2015 Nonemployee Director Compensation Policy, because he waived all compensation as a director of Juno.

90.    In November 2016, FW Cook, an executive compensation consulting firm, released the FW Cook Report.  According to the report, in 2015, the median nonemployee director compensation amount for "mid-cap" companies (i.e., companies with market capitalization between $1 billion and $5 billion) was $197,750.  Juno's average capitalization in 2015 was over $4.5 billion, and thus considered a mid-cap company.  The Company's lowest paid Nonemployee Director Defendant that year, defendant Klausner, received $552,752.  In other words, defendant Klausner received over $350,000 more than the median nonemployee director compensation amount for mid-cap companies in 2015.

91.    A majority of the Board's members (i.e., the Nonemployee Director Defendants) received excessive compensation in 2015 through the 2015 Nonemployee Director Compensation Policy, and therefore have direct financial interests in the policy.  Their approval of the policy constitutes self-dealing.  For these reasons, the Individual Defendants will have the burden of proving the entire fairness of the challenged director compensation.

92.    The Company's nonemployee directors also received excessive compensation in 2016.  According to Juno's 2017 Proxy, excluding defendant Daniel, who waived all compensation from Juno until April 2017, in 2016, Juno's nonemployee directors received between $344,168 and $381,396.  According to the FW Cook Report, the median compensation amount for nonemployee directors of mid-cap companies was $200,000 in 2016.  Juno was a mid-cap company in 2016, but its lowest paid nonemployee director, defendant Tessier-Lavigne, received $344,168 that year.  In other words, in 2016, Juno's lowest paid nonemployee director received nearly $150,000 more than the median compensation amount for nonemployee directors of mid-cap companies.

| Juno Therapeutics, Inc. (JUNO) Director Compensation: Comparison vs. Median Compensation Paid To Non-Employee Directors of Mid-Cap Companies |||||  |

### 2016

| Board Member | Fees Paid in Cash | Stock Awards | Option Awards | Total | Median Compensation For Non-Employee Directors of Mid-Cap Companies[A] |
|---|---|---|---|---|---|
| Howard H. Pien | - | $ 80,014 | $ 301,382 | $ 381,396 | |
| Hal V. Barron | - | $ 54,656 | $ 301,382 | $ 356,038 | |
| Thomas O. Daniel[1] | $ 100,000 | - | - | $ 100,000 | |
| Anthony B. Evnin | - | $ 57,516 | $ 301,382 | $ 358,898 | |
| Richard D. Klausner[2] | - | $ 47,508 | $ 301,382 | $ 348,890 | $ 200,000 |
| Robert T. Nelsen | - | $ 52,772 | $ 301,382 | $ 354,154 | |
| Marc Tessier-Lavigne[3] | $ 42,786 | - | $ 301,382 | $ 344,168 | |
| Mary Agnes Wilderotter | $ 64,500 | - | $ 301,382 | $ 365,882 | |
| **Total** | **$ 107,286** | **$ 292,466** | **$ 2,109,674** | **$ 2,509,426** | |
| **Median** | **$ 53,643** | **$ 54,656** | **$ 301,382** | **$ 356,038** | |

| 1) Excluded from Analysis: Daniel waived all FY 2015 and FY 2016 director compensation from Juno. The $100,000 Fees Paid in Cash in FY 2016 was paid by Celgene Corporation, not Juno. From July 1, 2016 through March 31, 2017, Dr. Daniel received $50,000 per quarter from Celgene for his service on the Juno Board.  Daniel's compensation has been excluded from this analysis. |
|---|
| 2) Klausner provides general advisory services to Juno under a consulting agreement in exchange for an annual fee of $250,000, paid quarterly. Such agreement expires December 31, 2018.  The $250,000 which Klausner received in 2016 for his service as a consultant has been excluded from this analysis. |
| 3) Tessier-Lavigne resigned from the Board on August 26, 2016. Upon his resignation from the Board, Juno entered into a consulting agreement with Tessier-Lavigne pursuant to which he provides general advisorys services to the Company in exchange for an annual fee of $50,000, paid monthly. Such agreement expires August 26, 2020.  The $17,397 which Tessier-Lavigne received in 2016  for his service as a consultant has been excluded from this analysis. |

(A) As reported by FW Cook's 2016 Director Compensation Report.

### 2015

| Board Member | Fees Paid in Cash | Stock Awards | Option Awards | Total | Median Compensation For Non-Employee Directors of Mid-Cap Companies[A] |
|---|---|---|---|---|---|
| Howard H. Pien | $ 77,500 | - | $ 505,252 | $ 582,752 | |
| Hal V. Barron | $ 55,000 | - | $ 505,252 | $ 560,252 | |
| Anthony B. Evnin | $ 60,567 | - | $ 505,252 | $ 565,819 | |
| Richard D. Klausner | $ 47,500 | - | $ 505,252 | $ 552,752 | |
| Robert T. Nelsen | $ 48,500 | - | $ 505,252 | $ 553,752 | $ 197,750 |
| Marc Tessier-Lavigne | $ 63,000 | - | $ 505,252 | $ 568,252 | |
| Mary Agnes Wilderotter | $ 55,433 | - | $ 505,252 | $ 560,685 | |
| **Total** | **$ 407,500** | **-** | **$ 3,536,764** | **$ 3,944,264** | |
| **Median** | **$ 55,433** | **-** | **$ 505,252** | **$ 560,685** | |

(A) As reported by FW Cook's 2016 Director Compensation Report.

93.     The Nonemployee Director Defendants' excessive 2015 and 2016 compensation was unwarranted.   During these years, the Company conducted clinical trials for JCAR015, which ultimately resulted in five Phase II/ROCKET trial patient deaths, and the Company's

decision to cease developing the product the following year.  Moreover, these disastrous results had a significant negative impact on market capitalization.  Since the Individual Defendants began making false and misleading statements regarding the safety, success, and efficacy of JCAR015, on June 4, 2016 to November 27, 2017, Juno's market capitalization has suffered a loss of over $5.2 billion, or 73.65%, and a stock price decline of $44.99 per share.

94.     Accordingly, although the Company paid the Nonemployee Director Defendants significantly more than nonemployee directors of similarly sized companies, the Individual Defendants oversaw the failure of its most important development product candidate, which severely damaged the Company's market value, as well as its reputation with investors and the public.

## THE CONSOLIDATED SECURITIES CLASS ACTION

95.     On June 14, 2017, Chief Judge Ricardo S. Martinez issued an order in the consolidated securities class action, denying defendants Bishop, Harr, Gilbert, and Juno's motion to dismiss.  Judge Martinez held that plaintiffs had stated a claim against these defendants.  The order stated: "Taking all facts pled as true, the Court agrees with Plaintiffs that Defendants may have had a duty to disclose the deaths at issue given the statements made in June and July of 2016."  As a result of this ruling, there is a significant likelihood that the Individual Defendants' misconduct and false statements, alleged herein, will cause Juno to incur substantial liability.

## DAMAGES TO JUNO

96.     As a result of the Individual Defendants' improprieties, Juno disseminated improper, public statements concerning the safety, success, and efficacy of JCAR015.  These improper statements have devastated Juno's credibility as reflected by the Company's over $5.2

billion, or 73.65%, market capitalization loss since June 4, 2016 (i.e., the date on which Juno began making improper statements about JCAR015).

97.     Juno's performance issues also damaged its reputation within the business community and in the capital markets.   In addition to price, Juno's current and potential customers consider a company's ability to accurately assess the quality and safety of its clinical trials and therapy products.  The Company requires a substantial amount of cash to complete the clinical development and commercialization of its CAR T cell therapy products.  Juno's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to Juno.

98.     Further, as a direct and proximate result of the Individual Defendants' actions, Juno has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement or judgment in the consolidated class action for violations of federal securities laws;

(b)     costs incurred from conducting the clinical trials on JCAR015 despite the serious deficiencies with the Phase II/ROCKET trial; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Juno.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of Juno to redress injuries suffered, and to be suffered, by Juno as a direct result of violation of securities

law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Juno is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100.    Plaintiff will adequately and fairly represent the interests of Juno in enforcing and prosecuting its rights.

101.    Plaintiff was a stockholder of Juno at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Juno stockholder.

102.    The current Board of Juno consists of the following ten individuals: defendants Bishop, Barron, Daniel, Evnin, Klausner, Nelsen, Pien, and Wilderotter, and nondefendants Jay T. Flatley ("Flatley") and Rupert Vessey.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Bishop, Barron, Daniel, Evnin, Klausner, Nelsen, Pien, and Wilderotter Face a Substantial Likelihood of Liability for Their Misconduct**

103.    The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Bishop, Barron, Daniel, Evnin, Klausner, Nelsen, Pien, and Wilderotter face a substantial likelihood of liability for repeatedly failing to comply with this duty.  For this reason, any demand made on them is futile.

104.    As alleged above, defendant Bishop breached his fiduciary duty of loyalty by making improper statements regarding the safety, success, and efficacy of JCAR015.  Juno's Code of Business Conduct and Ethics identifies defendants Bishop and Harr as official Company spokespersons for "public comment, press, marketing, technical, clinical and regulatory developments, and other such information."  Accordingly, defendant Bishop was responsible for

the misleading statements contained in the Company's June 4, 2016 press release and its June 7, 2016 corporate presentation.   Specifically, the June 4, 2016 press release and June 7, 2016 corporate presentation highlighted allegedly positive results for JCAR015, but failed to disclose that a Phase II/ROCKET trial patient had died the previous month.

105.   Additionally, defendant Bishop repeatedly misled investors and the public by claiming that the Phase II/ROCKET trial patient deaths resulted from the addition of flu to the JCAR015 therapy.   As alleged above, defendant Bishop made these false and misleading statements during conference calls with investors and analysts, and during presentations at various conferences.   Demand on defendant Bishop is futile because he faces a substantial likelihood of liability for breaching his fiduciary duties.

106.   Furthermore, defendants Bishop, Barron, Daniel, Evnin, Klausner, Nelsen, Pien, and Wilderotter allowed the Phase II/ROCKET trial to continue even though they knew that Phase II/ROCKET trial patients were dying as a result of severe neurotoxicity associated with JCAR015.   Given JCAR015's significance to the Company, the Board would have closely followed all important developments regarding the therapy.   Specifically, the Board would have been made aware of the findings from Juno's investigation concerning the first three Phase II/ROCKET trial patient deaths, and learned that the deaths resulted from severe neurotoxicity associated with the JCAR015 therapy itself.   Furthermore, the Board would have been acutely aware of how much capital was being spent on the development of the fatally toxic therapy. However, the Board chose to continue developing JCAR015.   Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

107.   The Audit Committee members, defendants Evnin, Nelsen, and Wilderotter, served as members of the Company's Audit Committee when Juno issued false and misleading

statements regarding the safety, success, and efficacy of JCAR015.   The Audit Committee Charter provides that the Audit Committee Defendants have the duty to review the Company's earnings press releases and quarterly financial statements.   As members of the Board, the Audit Committee Defendants were made aware of the findings from Juno's investigation concerning the first three Phase II/ROCKET trial patient deaths, and learned that the deaths resulted from severe neurotoxicity associated with the JCAR015 therapy itself.   Nonetheless, the Audit Committee Defendants failed to uphold their duty to review Company earnings press releases by allowing Juno to issue the August 4, 2016 earning press release, which contained the false and misleading representation that the addition of flu to JCAR015 caused the Phase II/ROCKET trial patient deaths.

108.    The Audit Committee Defendants also failed to uphold their duty to review Juno's quarterly financial statements by allowing the Company to submit its August 5, 2016 and November 9, 2016 Form 10-Q filings, which contained false and misleading representations: (i) that the addition of flu to JCAR015 caused the Phase II/ROCKET trial patient deaths; and (ii) that the Phase II/ROCKET trial "could support accelerated U.S. regulatory approval [of JCAR015] … as early as the first half of 2018."   For this reason, the Audit Committee Defendants face a substantial likelihood of liability for breaching their fiduciary duties of loyalty. Any demand made on defendants Evnin, Nelsen, and Wilderotter is futile.

109.    Defendants Barron, Daniel, and Klausner served as members of Juno's Scientific Committee when the Company issued false and misleading statements regarding the safety, success, and efficacy of JCAR015.   Pursuant to the Scientific Committee Charter, the Scientific Committee Defendants have the duty to "review, evaluate and report to the Board regarding strategy, plans and goals, as well as progress and performance, of the Company's clinical

programs and research and development activities."   It can be inferred that the Scientific

Committee Defendants reviewed and evaluated JCAR015, as the Individual Defendants referred

to the therapy as the Company's "most advanced development product candidate."  Accordingly,

the Scientific Committee Defendants reviewed the findings from Juno's investigation concerning

the first three Phase II/ROCKET trial patient deaths, and learned that the deaths resulted from

severe neurotoxicity associated with the JCAR015 therapy itself.   However, despite the

potentially fatal risks associated with JCAR015, the Scientific Committee Defendants allowed

the Phase II/ROCKET trial to continue, ultimately resulting in additional patient deaths and

Juno's decision to cease further development of its most important product candidate, JCAR015.

110.    Moreover, because of their review and evaluation of the Phase II/ROCKET trial,

the Scientific Committee Defendants were aware that the Individual Defendants were making,

and causing Juno to release, false and misleading statements concerning the safety, success, and

efficacy of JCAR015.   Nonetheless, the Scientific Committee Defendants failed to prevent the

Company from issuing these improper statements.  By engaging in, and allowing, the misconduct

described herein, the Scientific Committee Defendants breached their duties of loyalty to Juno.

These defendants  face  a  substantial  likelihood  of  liability  for  their  breaches  of fiduciary

duties.  Therefore, any demand upon defendants Barron, Daniel, and Klausner is futile.

111.    Defendants Barron, Klausner, Nelsen, Daniel, Wilderotter, Bishop, Pien, and

Evnin, caused the Company to issue the 2016 Proxy, through which they negligently misled Juno

stockholders.  These defendants claimed, in the 2016 Proxy, that the 2016 Nonemployee Director

Compensation  Policy  was  necessary  to  attract,  retain,  and  reward  Company  nonemployee

directors.   However,  the  Company  was  already  providing  its  nonemployee  directors  with

significantly excessive compensation, a problem the 2016 Nonemployee Director Compensation

Policy would continue.  The 2016 Proxy misled Juno stockholders by falsely representing that the 2016 Nonemployee Director Compensation Policy was necessary to attract, retain, and reward Juno investors.

112.    Furthermore, defendants Barron, Klausner, Nelsen, Daniel, Wilderotter, Bishop, Pien, and Evnin claimed in the 2016 Proxy that they were seeking stockholder approval for the 2016 Nonemployee Director Compensation Policy "in the interests of good corporate governance."  However, this statement misleadingly suggests that the Company was maintaining good corporate governance at the time the 2016 Proxy was issued.  During that time, Juno's Board and its Scientific Committee were failing to uphold their duties to review, evaluate, and manage the risks associated with JCAR015, the Company's most important development product candidate at the time.  Over the next several months, these failures led to the deaths of five Phase II/ROCKET trial patients, and Juno's decision to cease development of JCAR015.  Defendants Barron, Klausner, Nelsen, Daniel, Wilderotter, Bishop, Pien, and Evnin face a substantial likelihood of liability for their violations of securities law.  Accordingly, any demand upon these defendants is futile.

113.    Nonemployee Director Defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter, breached their duties of loyalty to the Company by providing themselves with excessive compensation in 2015.  According to the FW Cook Report, the median compensation for nonemployee directors at mid-cap companies was $197,750 in 2015.  However, even though Juno was a mid-cap company in 2015, Juno's lowest paid nonemployee director that year received $552,752, over $350,000 more than the median corresponding amount for mid-cap companies.  Juno's Compensation Committee, comprised of Nonemployee Director Defendants Nelsen and Pien, recommended that the Board approve these extravagant compensation amounts.

The Board, a majority of which was comprised of nonemployee directors, including defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter, approved these extravagant compensation amounts. Defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter face a substantial likelihood of liability for their breaches of fiduciary duties. Therefore, any demand upon these defendants is futile.

114.    Additionally, Nonemployee Director Defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter were compensated through the 2015 Nonemployee Director Compensation Policy. Accordingly, these defendants are interested in the unfair and extremely high compensation the Board awarded the Nonemployee Director Defendants through this policy. A majority of the Board derived unique personal financial benefits from, and has direct financial interests in, the 2015 Nonemployee Director Compensation Policy, which plaintiff has challenged in this Complaint. As a result, the Board is interested, and the Individual Defendants will have the burden of proving the entire fairness of the challenged director compensation.

115.    Defendant Bishop sold Juno stock under highly suspicious circumstances. As the Company's CEO, defendant Bishop possessed material, nonpublic company information and used that information to benefit himself. Defendant Bishop sold stock based on this knowledge of material, nonpublic company information concerning the safety, success, and efficacy of JCAR015 and the impending decrease in the value of his holdings of Juno stock. Accordingly, defendant Bishop faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty. Any demand upon defendant Bishop is futile.

116.    In Juno's 2017 Proxy, it disclosed that defendant Klausner was not considered an independent director "because of the amount of compensation he received in 2014 and 2016 as a consultant to Juno and the amount of consulting compensation he is anticipated to receive from

Juno in 2017." The 2017 Proxy further discloses that, "[defendant] Klausner provides general advisory services to [Juno] under a consulting agreement in exchange for an annual fee of $250,000, paid quarterly. Such agreement expires December 31, 2018."

117.    Moreover, in 2016, the Board entered into a consulting agreement with defendant Barron that would allow him to receive up to $100,000 per year. However, the Board claimed that this compensation arrangement would not compromise his independence. In order maintain these lucrative consulting relationships with Juno, defendants Klausner and Barron must maintain positive relationships with Juno's CEO, defendant Bishop, and the other current members of the Board. Accordingly, defendants Klausner and Barron lack independence from the other members the Board, and any demand made on them would be futile.

118.    In addition, defendant Nelsen is a cofounder and managing director of ARCH Venture Partners ("ARCH"). Defendant Daniel is an ARCH venture partner. ARCH is a venture capital firm that invests in the development of seed and early stage advanced technology companies, primarily companies that ARCH cofounds. In his capacity at ARCH, defendant Nelsen has played a significant role in the early sourcing, financing, and development of more than thirty companies, including Juno. Furthermore, ARCH participated in Juno's initial $176 million Series A Financing round in April 2014 and again in Juno's $134 million Series B Financing round in August 2014. As of March 31, 2017, ARCH owned over 10.5 million shares, or 10%, of Juno's outstanding common stock.

119.    ARCH has also provided substantial financial support to multiple companies in which Board members are involved:

(a)     Ikaria, Inc. ("Ikaria") has received significant investments from ARCH. Defendant Pien served as an Ikaria director from April 2010 to January 2014.  Defendant Nelsen served as an Ikaria director from March 2007 to March 2015;

(b)     ARCH has committed to funding Bellerophon Therapeutics, Inc. ("Bellerophon"), a spinoff of Ikaria.  Defendant Pien served as a Bellerophon director from February 2014 to at least November 2014.  Defendant Nelsen served as a Bellerophon director from February 2014 to December 2015;

(c)     ARCH is a founding investor of Denali Therapeutics Inc.'s ("Denali") Series A financing.  Defendant Nelsen and nondefendant Flatley are Denali directors; and

(d)     ARCH is a key investor in GRAIL, Inc. ("GRAIL").  Defendant Nelsen is a GRAIL director.  Defendant Klausner is a GRAIL director and Scientific Advisory Board Member.  Defendant Barron is also a member of GRAIL's Scientific Advisory Board. Nondefendant Flatley served as a GRAIL director from January 2016 to March 2017.  He served as the Chairman of GRAIL's board from January 2016 to March 2017.

120.    In order to ensure ARCH's continued financial support of Juno and the companies referenced in the preceding paragraph, the Board must maintain positive relationships with defendants Nelsen and Daniel.  For this reason, the Board lacks independence from defendants Nelsen and Daniel, and any demand made on the Board is futile.

121.    Similarly, Venrock, Inc. ("Venrock") is a venture capital firm that participated in Juno's initial $176 million Series A Financing round in April 2014 and again in Juno's $134 million Series B Financing round in August 2014.  Defendant Evnin has served as a Venrock partner since 1974, and is responsible for building the firm's healthcare franchise.  Moreover,

Venrock has provided substantial financial support to multiple companies in which Board members are involved:

(a)      Ikaria has received significant investments from Venrock.  As previously discussed, defendants Pien and Nelsen have served as Ikaria directors;

(b)      Venrock has invested in AVEO Pharmaceuticals, Inc. ("AVEO"). Defendant Evnin is an AVEO director.  Defendant Klausner has served on the company's Scientific Advisory Board;

(c)      Venrock has invested in Infinity Pharmaceuticals, Inc. ("Infinity"). Defendant Evnin is an Infinity director.  Defendant Klausner served as an Infinity Scientific Advisory Board Member and cochair from September 2006 to December 2006; and

(d)      Venrock has invested in Constellation Pharmaceuticals, Inc. ("Constellation").  Defendant Evnin is a Constellation director.  Defendant Klausner served as a Constellation Scientific Advisory Board Member from at least April 2008 to at least August 2009.

122.    In order to ensure ARCH's continued financial support of Juno and the companies referenced in the preceding paragraph, the Board must maintain positive relationships with defendant Evnin.  For this reason, the Board lacks independence from defendants Nelsen and Daniel, and any demand made on the Board is futile.

123.    The Company's relationship with Celgene Corporation ("Celgene") has also compromised the Board's independence.  As of March 31, 2017, Celgene owned 10% of Juno's common stock.  Moreover, in June 2015, Celgene and Juno announced they had entered into a ten-year global collaboration for the development and commercialization of immunotherapies. According to media reports, Celgene paid Juno up to $1 billion as part of this deal.  The deal also

gave Celgene the ability to nominate a member of Juno's Board.  Defendant Daniel served as Celgene's representative on Juno's Board from August 2015 to June 2016.  He has also served as a Celgene Consultant, Executive Vice President, and President of Research and Early Development.  In order to continue the Company's highly profitable relationship with Celgene, the Board must maintain a positive relationship with defendant Daniel.  Accordingly, the Board lacks independence from defendant Daniel, and any demand made on the Board is futile.

124.    Plaintiff has not made any demand on the other stockholders of Juno to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Juno is a publicly held company with over 114 million shares outstanding and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## <u>COUNT I</u>

**Against the 2016 Proxy Defendants for Violation of Section 14(a) of the Exchange Act**

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of 2016 Proxy Defendants Barron, Klausner, Nelsen, Daniel, Tessier-Lavigne, Wilderotter, Bishop, Pien, and Evnin.  The section 14(a) Exchange Act claims alleged herein do not allege

and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

127.   The 2016 Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2016 Proxy.  The 2016 Proxy contained a proposal for the ratification of the 2016 Nonemployee Director Compensation Policy.  The 2016 Proxy Defendants claimed, in the 2016 Proxy, that the 2016 Nonemployee Director Compensation Policy was necessary to attract, retain, and reward Company nonemployee directors.  However, the Company was already providing its nonemployee directors with significantly excessive compensation, a problem the 2016 Nonemployee Director Compensation Policy would perpetuate.  The 2016 Proxy misled Juno stockholders by falsely representing that the 2016 Nonemployee Director Compensation Policy was necessary to attract, retain, and reward Juno nonemployee directors.

128.   Moreover, the 2016 Proxy Defendants represented, in the 2016 Proxy, that they were seeking stockholder approval for the 2016 Nonemployee Director Compensation Policy "in the interests of good corporate governance."  However, this statement misleadingly suggests that the Individual Defendants were maintaining good corporate governance at the time the 2016 Proxy was issued.  During that time, the Board and its Scientific Committee were failing to uphold their duties to review, evaluate, and manage the risks associated with JCAR015.  These failures ultimately resulted in five Phase II/ROCKET trial patient deaths, and the Company's decision to discontinue JCAR015.

129.   By reasons of the conduct alleged herein, the 2016 Proxy Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of the 2016 Proxy

Defendants' wrongful conduct, Juno misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Juno's recommendation to ratify the 2016 Nonemployee Director Compensation Policy.

130.   The misleading information contained in the 2016 Proxy was material to Juno's stockholders in determining whether to approve the 2016 Nonemployee Director Compensation Policy.  The proxy solicitation process in connection with the 2016 Proxy was an essential link in the policy's ratification.

131.   Plaintiff, on behalf of Juno, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2016 Proxy in connection with the improper approval of the 2016 Nonemployee Director Compensation Policy.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   The Individual Defendants owed and owe Juno fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Juno the highest obligation of good faith, fair dealing, loyalty, and due care.

134.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Juno, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

135.    The Officer Defendants either knew or were reckless in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew or were reckless, in not knowing: (i) that JCAR015 was associated with severe neurotoxicity; and (ii) that the Company's statements regarding JCAR015's safety, success, and efficacy were false and misleading.  Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

136.    The Director Defendants, as directors of the Company, owed Juno the highest duty of loyalty.  These defendants breached their duties of loyalty by knowingly or recklessly permitting the improper activity concerning JCAR015's disastrous Phase II/ROCKET trial.  The Director Defendants knew or were reckless in not knowing: (i) that JCAR015 was associated with severe neurotoxicity; and (ii) that the Company's statements regarding JCAR015's safety, success, and efficacy were false and misleading.  Accordingly, the Director Defendants breached their duties of loyalty to the Company.

137.    The Audit Committee Defendants breached their fiduciary duties of loyalty by knowingly and recklessly failing to properly review Juno's earnings press releases and quarterly financial statements, as required by the Audit Committee Charter in effect at the time.

138.    The Scientific Committee Defendants breached their fiduciary duties of loyalty by knowingly and recklessly failing to properly review, evaluate, and report to the Board, regarding JCAR015's progress and performance, as required by the Scientific Committee Charter in effect at the time.

139.    The Nonemployee Director Defendants breached their duties of loyalty by causing the Company to provide them with excessive compensation in 2015.  Defendants Nelsen and Pien, as members of the Compensation Committee, knowingly or recklessly recommended

that the Board provide the Nonemployee Director Defendants with excessive compensation by approving the 2015 Nonemployee Director Compensation Policy, described herein. Subsequently, the Nonemployee Director Defendants, as members of the Board, knowingly or recklessly provided themselves with excessive compensation by approving the 2015 Nonemployee Director Compensation Policy.

140.   Defendant Bishop breached his duty of loyalty by selling Juno stock on the basis of his knowledge of the improper information described above before that information was revealed to the Company's stockholders.   The information described above was proprietary, nonpublic information concerning the Company's future business prospects.   It was a proprietary asset belonging to the Company, which defendant Bishop used for his own benefit when he sold Juno common stock.

141.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Juno has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

142.   Plaintiff, on behalf of Juno, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

143.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.   The Individual Defendants breached their fiduciary duties to the Company by certifying the transfer of substantial corporate assets towards the development of JCAR015, despite  serious deficiencies with the therapy, for which no consideration at all will be received. As a result of the severe neurotoxicity associated with JCAR015, multiple patients died and the

Company was forced to stop developing the critical product candidate.   The JCAR015 fiasco also prevented Juno from becoming the first company to market an FDA approved CAR T cell therapy.   In April 2017, Juno competitor Novartis announced that the FDA had approved its CAR T cell therapy product, "Kymriah."   The FDA's approval of Kymriah will cause the medical community and the public to view Novartis as the leading company in the CAR T cell therapy field, thus limiting the success and impact of any future CAR T cell therapy products that Juno develops.   By allowing the Phase II/ROCKET trial to continue, despite the therapy's potentially fatal side effects, the Individual Defendants have committed corporate waste in an exchange that no business person of ordinary and sound judgement could conclude resulted in adequate consideration.

145.   The Director Defendants wasted corporate assets by providing the Nonemployee Director Defendants with significantly greater compensation than nonemployee directors of similarly-sized companies in 2015.   Although Juno was a mid-cap company in 2015, its lowest paid nonemployee director that year received over $350,000 more than the median compensation amount for nonemployee directors of mid-cap companies in 2015.   No business person of ordinary and sound judgement could conclude that such extravagant compensation for Juno's nonemployee directors constituted adequate consideration for the services they provided to Juno as Board members.

146.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

147.   Plaintiff, on behalf of Juno, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Juno.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Juno.

150.    The Nonemployee Director Defendants unjustly enriched themselves by abusing their power, as members of Juno's Board, to provide themselves with excessive compensation in 2015.

151.    Defendant Bishop sold Juno stock while in possession of material, adverse nonpublic information that artificially inflated the price of Juno stock.   As a result, defendant Bishop profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

152.    Plaintiff, as a stockholder and representative of Juno, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

153.    Plaintiff, on behalf of Juno, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Juno, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of securities law;

B.      Directing Juno to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Juno and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over its CAR T cell therapy product development process;

2.      a proposal to strengthen Juno's oversight of its disclosure procedures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.      a provision to permit the stockholders of Juno to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Juno has an effective remedy;

D.      Awarding to Juno restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

January 3, 2018                                      **COOCH AND TAYLOR, P. A.**

                                                    */s/ Blake A. Bennett*
                                                    Blake A. Bennett (#5133)
                                                    The Brandywine Building
                                                    1000 West Street, 10th Floor
                                                    P.O. Box 1680
                                                    Wilmington, DE 19899
                                                    Telephone: (302) 984-3889
                                                    Facsimile: (302) 984-3939
                                                    E-mail: bbennett@coochtaylor.com
                                                    *Attorneys for Plaintiff*

**OF COUNSEL**
ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
STEVEN R. WEDEKING
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        farroyo@robbinsarroyo.com
        swedeking@robbinsarroyo.com